08 CV 3507

JUDGE KAPLAN

James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200
Telefax:  (212) 385-9010
E-mail:  jim.hohenstein@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
James N. Hood as Liquidating Trustee of the
Oceantrade Corporation Liquidating Trust



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JAMES N. HOOD AS LIQUIDATING TRUSTEE
OF THE OCEANTRADE CORPORATION
LIQUIDATING TRUST,

           Plaintiff,

    -against-

KW BULKERS LTD.,

           Defendant.

---

08 Civ.     (   )

**VERIFIED COMPLAINT**

---

    Plaintiff, James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), by and through its attorneys, Holland & Knight LLP, for its verified complaint against defendant, KW Bulkers Ltd., ("KWB" or "Defendant"), alleges, upon information and belief, as follows:

1.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all material times herein, James N. Hood as Liquidating Trustee for the Oceantrade Corporation Liquidating Trust maintained and maintains an address at 285 Highland Avenue, Norwalk, CT, 06854-4017.

3.      On or about October 15, 2005, Oceantrade Corporation ("Oceantrade") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*.

4.      On or about October 4, 2007, Oceantrade filed a Chapter 11 Plan of Liquidation ("Plan"), which was confirmed by order of the Bankruptcy Court for the Southern District of New York on December 4, 2007 ("Confirmation Order").

5.      Pursuant to the Plan and the Confirmation Order, James N. Hood was appointed as Liquidating Trustee, with full authority to assert, prosecute, and settle all causes of action including, but not limited to, causes of action on behalf of Oceantrade against third parties relating to accounts receivable.

6.      At all times material herein, Oceantrade  was a business entity organized and existing under the laws of the Marshal Islands with a principal place of business at c/o Bulkamerica Corporation, 137 Rowayton Avenue, Rowayton, Connecticut, 06853.

7.      At all times material herein, Bulkamerica Corporation ("Bulkamerica") was agent for Oceantrade under an agency agreement dated August 31, 2001 and engaged in business transactions on behalf of Oceantrade pursuant to that agreement, including the transaction herein.

8.      At all times material herein, KWB was a business entity incorporated under the laws of the British Virgin Islands with a principal place of business at Room 2401, Guo Yi Hotel, No. 1 Wenxing Dongjie, Xi Cheng District, 10044, Beijing, China.

9.      On or about June 23, 2004 Oceantrade, as Disponent Owner[1] of the vessel THOMAS C ("Vessel"), and Defendant, as Charterer, entered into a charter party for the Vessel ("Time Charter"). A true and correct copy of the fixture recap of the Time Charter is attached hereto as Exhibit 1. A true and correct copy of the Time Charter itself is attached hereto as Exhibit 2.

10.     The Vessel is a bulk carrier of 46,685 metric tons deadweight, built in 1999 and registered in the Cayman Islands. Oceantrade agreed to charter the Vessel to Defendant as Charterer "for one time charter trip from China to India," (Exhibit 2, lines 14-15) at a rate of hire of "US$15,500 daily." Exhibit 2, line 51.

11.     Clause 45 of the Time Charter is a "Stevedore damages" clause, which provides that:

> Charterers shall not be responsible for any damages sustained to the vessel or her fittings during loading and discharging unless such damages are notified in writing to Charterers' representatives or their local agents by the Captain within 24 hours of occurrence .
> . .

12.     Additional Clauses of the Time Charter warrant that the Vessel had four (4) working cranes of 30-ton capacity. Exhibit 2, Timecharter Description Clause.

13.     For the duration of this Time Charter on the voyage from China to India the Vessel was time chartered to Oceantrade by Daeyang Shipping Co., Ltd., ("Daeyang") as

---

[1] A disponent owner is the person or company who controls the commercial operation of a vessel and is responsible for deciding ports of call and the cargoes to be carried. Very often, the disponent owner is not the registered owner having title to the vessel but a party who has previously chartered the vessel from the registered owner or another charterer. Peter Brodie, DICTIONARY OF SHIPPING (4th ed. 2003).

disponent owner, under a time charter party, dated March 31, 2004. Daeyang, in turn, had time chartered the Vessel from Armada Bulk Carriers Ltd., ("Armada") as disponent owner, under a time charter party, dated March 11, 2004. Armada, in turn, had time chartered the Vessel from her registered owner, Thomas Navigation Company LLC. ("Thomas").

14.    The time charter party between Daeyang and Oceantrade contained an identical Stevedore damages clause to that in the Time Charter between Oceantrade and KWB, but provided for arbitration in New York. The time charter party between Daeyang and Armada contained the same Stevedore damages clause and provided also for arbitration in New York.

15.    The Vessel was delivered to KWB on arrival at the sea pilot station at Lianyungang, China on July 2, 2004 at 0130 hours local time. In Lianyungang the Vessel was loaded with a cargo of 32,970 metric tons of metallurgical coke in bulk for discharge in Chennai, India and sailed from Lianyungang on July 4 at 2130 hours local time.

16.    The Vessel arrived at Chennai on July 18 at 0100 hours local time where it was consigned to a port agent appointed by KWB, Messrs. Canopus Shipping & Trading Pvt., Ltd. ("Canopus").

17.    KWB also appointed South India Corporation (Agencies) Limited  as stevedores to discharge the Vessel ("Stevedores"). Discharge commenced using the Vessel's cranes on July 19 at 1855 hours local time. The cranes were operated by the Stevedores throughout discharge.

18.    As is customary in many bulk cargo trades, during discharge the Stevedores placed a bulldozer in the Vessel's holds to move cargo to the center of the holds from those areas at the sides and ends of the holds where the grabs used to discharge the cargo could not conveniently reach the cargo.

19.    Upon completion of cargo discharge, the Stevedores lifted the bulldozer onto the wharf using number 2 crane and left the Vessel.

20.    After the Stevedores had departed the Vessel, the Vessel's crew discovered that number 2 crane jib had been damaged while the Stevedores were lifting the bulldozer back onto the wharf.

21.    The Master reported this damage to Oceantrade and to KWB immediately after sailing and within 24 hours of the damage's occurrence pursuant to Clause 45 of the Time Charter.  In addition, Oceantrade notified KWB of this damage.

22.    The Vessel was redelivered from KWB to Oceantrade upon dropping the outward pilot off Chennai on July 23, 2004 and 1826 hours local time.

23.    Subsequently, KWB denied liability and/or responsibility for the damage to number 2 crane jib under the Time Charter.

24.    Oceantrade also denied liability and/or responsibility under its charter party with Daeyang and denied liability for the damage.

25.    Daeyang took a similar position under its charter party with Armada.

26.    A survey of the damaged crane in Mumbai, India by the Vessel's classification society, American Bureau of Shipping, determined that crane number 2 could not be used until the damaged jib had been repaired.  This information was conveyed to Oceantrade on August 3, 2004 by Apex Marine Ship Management Co., LLC., ("Apex") who acted as managers of the Vessel on behalf of the registered owner Thomas.

27.    As a result of the damage to crane no. 2 only three of the Vessel's cranes were available to discharge the cargo in Mumbai which thus prolonged the discharge time by about 8 hours.

28.    The Vessel sailed from off Mumbai on or about August 6, 2004 to Onslow, Western Australia where a cargo of salt was loaded for discharge in Mizushima, Japan.

29.    There were no facilities for repairing the crane in Onslow and repairs could only be carried out after completion of discharge in Mizushima, on or about August 9, 2004, immediately prior to redelivery to Daeyang.

30.    KWB continued to maintain its position that it was not liable to Oceantrade for the damage and Oceantrade continued to maintain an identical position under its charter party with Daeyang.  Likewise, Daeyang took a similar position with respect to Armada.

31.    Oceantrade withheld approximately $111,000.00 in hire payable to Daeyang for: i) losses Oceantrade suffered as a result of the non-availability of crane number 2 while discharging at Mumbai; ii) delays resulting from the registered owner's (Thomas') failure to repair the crane at that port as originally contemplated; and, iii) a delay of about 30 hours at Mizushima to repair the crane prior to redelivery.

32.    Daeyang initiated arbitration in New York as provided in the time charter party between Daeyang and Oceantrade.

33.    Arbitrators were appointed by both parties, but the arbitration was stayed as a result of Oceantrade's filing under chapter 11 of the United States Bankruptcy Code.

34.    However, Armada, who had time chartered the Vessel to Daeyang, also initiated arbitration in New York in its dispute with Daeyang on the identical issue.

35.    On the evidence presented by the parties, the Panel its Final Award, dated June 26, 2006, awarded Armada $67,999.97 for repair costs to crane number 2 plus interest and costs. A true and correct copy of the Final Award, dated June 26, 2006, is attached hereto as Exhibit 3.

36.    In view of the Panel's award in the Armada-Daeyang New York arbitration, Oceantrade subsequently reached a commercial settlement with Daeyang on all outstanding claims under the Time Charter in conjunction with settlement of all outstanding claims under the time charter party, dated November 9, 2004, between Oceantrade and Daeyang.

37.    On reaching settlement with Daeyang, Oceantrade re-issued its invoice to KWB on September 27, 2006 in the amount of $152,379.27. A true and correct copy of the revised invoice, dated September 27, 2006 is attached hereto as Exhibit 4.

38.    Notwithstanding Oceantrade's demand for payment of the outstanding monies set forth in the invoice dated September 27, 2006, KWB has refused to pay the amount demanded.

39.    In accordance with the terms of the fixture recap and Clause 48 of the Time Charter, Oceantrade's claim for reimbursement of losses incurred is subject to London arbitration with the application of English law, which Oceantrade will initiate in due course.

40.    It is estimated that it will take until December 31, 2008 to resolve this dispute.

41.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in London arbitration proceedings.

42.    As best can now be estimated, Oceantrade expects to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | On the principal claim: | $152,379.27 |
| B. | Interest at 6% from September 27, 2006 through December 31, 2008: | $20,690.18 |
| C. | Costs (arbitrators fees, etc.): | $25,000.00 |
| D. | Attorneys' fees | $50,000.00 |
| | Total: | $248,069.45 |

43.     KWB is not found within the Southern District of New York but does have assets, good or chattels within the jurisdiction, to wit: funds or accounts held in the name of KW Bulkers Ltd. with, upon information and belief, the following financial institutions:  ABN Amro Bank; American Express Bank; Banco Popular; Bank of America, N.A.; Bank of China; Bank Leumi USA; The Bank of New York; BNP Paribas; Calyon Investment Bank; Citibank, N.A.; Commerzbank; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Standard Chartered Bank; Société Générale; UBS AG; Wachovia Bank, N.A.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; Korea Exchange Bank or any other financial institution within the Southern District of New York.

44.     While all disputes arising out of the Time Charter are to be arbitrated in London, England, the action herein is submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty Claims of the Federal Rules of Civil Procedure, as well as 9 U.S.C. § 8, and is not and cannot be considered a waiver of the parties' agreement to arbitrate.

**WHEREFORE**, Plaintiff demands judgment as follows:

1.     That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of KW Bulkers Ltd. with the financial institutions noted above in paragraph 43;

2.     That KW Bulkers Ltd. and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.    That judgment be entered in favor of James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust, and against KW Bulkers Ltd. in the amount of $248,069.45; and,

4.    That this Court grant James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust, such other and further relief which it may deem just and proper.

Dated: New York, New York
        April 10, 2008

HOLLAND & KNIGHT LLP

By: _____

James H. Hohenstein
Lissa D. Schaupp
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Telefax: (212) 385-9010
E-mail: jim.hohenstein@hklaw.com
        lissa.schaupp@hklaw.com

Attorneys for Plaintiff,
*James N. Hood as Liquidating Trustee*
*of the Oceantrade Corporation Liquidating Trust*

## VERIFICATION

STATE OF NEW YORK        )

                                  :ss.:

COUNTY OF NEW YORK     )

JAMES H. HOHENSTEIN, being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for James N. Hood as Liquidating Trustee of the Oceantrade Corporation Liquidating Trust ("Plaintiff"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiff and corresponded with Plaintiff regarding this matter. I am authorized by Plaintiff to make this verification, and the reason for my making it as opposed to the Plaintiff is that he is not within the jurisdiction of this Honorable Court.

_____
James H. Hohenstein

Sworn to before me this
_10th_ day of April, 2008

_____
Notary Public

DIALYZ E. MORALES
Notary Public, State Of New York
No. 01MO6059215
Qualified In New York County
Commission Expires June 25, 20_11_

# 5245091_v1

10

# EXHIBIT 1

JAMES HOOD LLC    Fax:2038319757    Apr  4 2008 07:57am P002/003
Page 1 of 2
Received 6/23/2004 10:4   AM - John Kerr <handy@howerobins   com>
Subject: THOMAS C/KW FXTRE RECAP
User: SAM

Howe Robinson Shipbrokers London
Dry Cargo / Handy ~ Owners - Erlebach Depts
Tel: +44 (0)20 7488 3444  Fax: +44 (0)20 7457 8799
E-mail: handy@howerobinson.com

JEK16377095   23/06/04   15:35:10


PHIL/JOHN
CC KEMY HR POST FIXTURE

THOMAS C/KW BULKERS CP 23/6/04
===================
WE CNFRM HABVING FIXED AS FOLLOWS

M/V THOMAS C

PANDC PLS

A/C KW BULKERS LTD:, OF BRITISH VIRGIN ISLANDS.

VSLS DESC AS PER HEAD C/P

- DEL AFSPS FOR LIANYUNGANG ATDNSHINC
- LAYCAN 29JUNE/2ND JUL 04. BALTIME CANC CLS TO APPLY.
- FOR ONE TCT AA SP/BS WIIWL VIA CHINA TO INDIA WITH INT COAL/COKE
- REDEL DLOSP SPS PARADIP-NEW MANGALORE RGE PICO ATDNSHINC
- HIRE USD 15,500 DLY IF REDEL W C INDIA
  HIRE USD 15,000 DLY IF REDEL E C INDIA
- ILOHCL USD4,000
- CEV USD1,250
- ON DELY VSLS EXPECTED TO HAVE ABT 550MT IFO AND ABT 50MT MDO.
  BOD SUFF TO REACH DISCH PORT WITH SAFETY MARGIN
  BOR AOB WITHOUT REPLENISHMENT BY CHS.
  CHS TO PAY OWS ESTIMATED CONSUMABLE BUNKER FOR THE VOY
  TOGETHER WITH FIRST HIRE PAYMENT.
  OWS OPTION TO REPLENISH BUNKERS IN SPORE AT OWS TIME RISK AND
  EXPENSE.
- BUNKER PRICES: USD190.00/350.00PMT FOR IFO/MDO RESP
- LOI CLS: IN THE EVENT THAT THE ORIGINAL B/LS FAIL TO ARRIVE TIMELY
  AT THE PORT OF DISCHARGE MASTER/OWS TO ALLOW VSLS TO DISCH WITHOUT
  DELAY AGAINST CHS SINGLE LOI DRAWN IN ACCORDANCE WITH OWS PANDI
  CLUB WORDING AND SIGNED BY CHS ONLY. (SEE CLS 59 OF OWS BTB HD C/P)
- 2,5 PCT ADCOM + 1.25 PCT HOWE ROB LDN

OWISE TERMS OF OWS BTB HD C/P DTD 31/3/04 LOGICALLY AMMENDED IN
ACCORDANCE WITH M/T PLUS THE FOLL ALTS;

GA/ARB IN LDN WITH ENGLISH LAW TO APPLY.

THE ISPS CERTIFICATE IS ON BOARD THE VSL.

(PLS ADVS BANKING DETAILS)

ENDS

HOPE YOU FIND THE ABOVE TO BE INORDER. THKS VMUCH FOR THIS FURTHER
FIXTURE.

DONT MISS THE CANC DATE.
RGDS
+++

========================

Many thanks for this fixture and your kind support - please advise if
any mistakes/discrepancies in recap.

Post-fixture matters will be handled by Kemy Koleva

All post-fixture messages should be addressed to
E-Mail: drypostfix@howerobinson.com
Fax   : + 44 20 7457 8799
Telex : 8811461
Phone : + 44 20 7488 3444

Dry P-F Contact details
                   Direct            AOH               Mobile
Elena Chrusciel    +44 20 7457 8745  +44 20 8851 4285  +44 7903 663863
Justin Grillo      +44 20 7457 8775  +44 1483 527778   +44 7979 865061
Dave Grundy        +44 20 7457 8429  +44 1276 24347
Iva Semeradova     +44 20 7457 8458  +44 20 7790 1530  +44 7967 550997
Kemy Koleva        +44 20 7457 8731

1.25% commission to Howe Robinson Shipbrokers is to be inserted in C/P.

Please note we will be collecting our commission from Owners and
will debit them accordingly.

RGDS/JEK

# EXHIBIT 2





# Time Charter
### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946



1 **This Charter Party**, made and concluded in *London* ............................................*23rd* day of *June* ............... 19 *2004*

2 Between *OCEAN TRADE CORPORATION, Marshall Islands* ..........................................................................................

3 Owners of the good ..... *Cayman Island Flag* ........ Steamship/Motorship *"THOMAS C" See Description as attached* of ............

4 of .................... ~~tons gross register, and~~ .................... ~~tons net register, having engines of~~ .................... ~~indicated horse power~~

5 ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ .................................................

6 ~~at~~ .................... ~~of about~~ .................... ~~cubic feet bale capacity, and about~~ .................... ~~tons of 2240 lbs.~~

7 ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons) on a draft of~~ .................... ~~feet~~ .................... ~~inches on~~ .................... ~~Summer freeboard, inclusive of permanent bunkers,~~

9 ~~which are of the capacity of about~~ .................... ~~tons of fuel, and capable of steaming, fully laden, under good weather~~

10 ~~conditions about~~ .................... ~~knots on a consumption of about~~ .................... ~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now *trading* .......................................................................................................................................................

12 ........................... and *K. W. BULKERS* .......................... Charterers of the ~~City~~ of *British Virgin Islands* ...........................

13 *Witnesseth*, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ *for one time charter trip safe port(s), safe berth(s), always afloat, always within Institute Warranty Limits (See Line 32),*

15 *China to India* .......................................... within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations*

17 *hereunder*

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ *arrival first sea pilot station for Lianyungang any time day or night*

19 *Sundays and Holidays included.*

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

20 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her *arrival first load port*

21 *delivery* to be

22 ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo service (See Clause 72)*, having

22 ~~water ballast, winches and~~ .................................................................................................................................

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, ~~including petroleum or its products, in proper containers~~, excluding *See Clause 39*

26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29 ~~Mexico, and/or South America~~ .................................................................................................... ~~and/or Europe~~

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~

32 *Charterers' option to break Institute Warranty Limits against paying additional premium not exceeding what would be charged*

33 *if vessel was insured by Lloyds of London and always net of all rebates, and always with Owners' and their underwriters*

34 *consent which not to be unreasonably withheld.*

35 as the Charterers or their Agents shall direct, on the following conditions:

36     1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees *including agency fees* of the Crew;

36 shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with all certificates necessary to comply with*

38 *requirements at all ports of call.*

39     2.   That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *canal dues, river tolls,*

39 *compulsory* Pilotages, *Skaw/Belt/Cannakale/Bosphorus included but Master not to request pilots unreasonably, including Canal*

39 *pilotages*, Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew), *compulsory garbage* and all other usual expenses except those before stated, but when the vessel

40 puts into

41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew *or cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while

42 vessel is employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48     3.   That the Charterers, *upon* at the port of delivery, and the Owners, *upon* at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel ~~at the current prices in the respective ports, the vessel to be delivered with not less than~~ .................... ~~tons and not more than~~

50 ........................ ~~tons and to be re-delivered with not less than~~ .................... ~~tons and not more than~~ .................... ~~tons.~~

51     4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$15,500 daily including overtime if redelivery West*

52  *Coast India, US$15,000 if redelivery East Coast India* ........ United States Currency ~~per ton on vessel's total deadweight carrying capacity, including~~
52  ~~bunkers and~~

53  ~~stores, on~~ ................................................ ~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54  and after the same rate for any part of a ~~month~~ *day*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot safe port within trading limits any time day or*

56  *night Sundays and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than *20/15/12/7* days

57  notice of vessels expected date of re-delivery, and probable port *and 5 days definite notice.*

58   5.  Payment of said hire to be made in New York *(See Clause 57)* in cash in United States Currency, ~~semi-monthly~~ *every 15 days* in advance, and

58  for the last *15 days* ~~half month~~ or

59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64  ~~to have the privilege of using vessel at once; such time used to count as hire.~~

65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain *subject to Owners' approval*, by the Charterers or

65  their Agents, subject

66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67  of such advances. *Charterers not allowed to do any deductions from hire payments without Owners' prior approval.*

68   6.  That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place *in safe port or elsewhere that*

68  Charterers or their Agents may

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at *Argentina, River plate, Brazil, Paranam, Buenaventura,* ~~such~~

69  ~~places~~ *Sauda, Lagos, Frederikstad, which not to be unreasonably withheld by Owners after the checking same,* where it is customary

69  for similar size vessels to safely

70  lie aground *and Charterers are at liberty to inquire with Owners about NAABSA at other ports or places where it is customary for*

70  *ships of similar size to go NAABSA and such approval shall not be unreasonably withheld by Owners.*.

71   7.  That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74  ~~paying Owners~~ .................................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75  ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76   8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency, and Charterers are to load, stow, and trim, *secure, lash, unlash, tally and discharge* the cargo at their expense under the supervision of the

78  Captain, who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts.

80   9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82   10.  That the Charterers have permission to appoint a Supercargo, who shall accompany the vessel *at this own risk and standard LOI to be*

82  *lodged with Master on his boarding* and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $12.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying ~~at the current rate~~ per meal, for all such victualling *USD1250 per month/pro rata including*

85  *entertainment/communications and representations.*

86   11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs *in English*, showing the course of the vessel and distance

88  run and the con-

89  sumption of fuel.

90   12.  That the Captain shall use diligence in caring for the ventilation of the cargo. *The vessel has natural ventilation only.*

91   ~~13.  That the Charterers shall have the option of continuing this charter for a further period of~~ ...............................................

92  ...............................................

93  ~~on giving written notice thereof to the Owners or their Agents~~ ..................... ~~days previous to the expiration of the first named term, or any declared option.~~

94   14.  That if required by Charterers, time not to commence before *29th June, 2004* ................................................ and should vessel

95  not have given written notice of readiness on or before *2nd July, 2004* ................................................ ~~but not later than 4 p.m.~~ Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to give delivery pre-notice*

96  *20/15 days approximate and 10/7/5/3/2/1 days definite notice.*

97   15.  That in the event of the loss of time from *and/or default of Owners' men or* deficiency of ~~men or stores,~~ fire, breakdown or damages to hull,

97  machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *due to vessel's*

98  *fault.*

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101 thereof, and all extra expenses shall be deducted from the hire. *To be supported by invoices, vouchers which to be forwarded to the Owners.*

102  16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the



106 purpose of saving life and property.

107    17.    That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred ~~to three persons at~~ *in* New York, *as per*
107 *Clause 48*
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

110    18.    That the Owners shall have a lien upon all cargoes, and all sub-freights/*sub-hires* for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114    19.    That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules *1974 as amended 1994* ~~1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided~~
116 ~~for by these~~
117 ~~Rules, according to the laws and usages at the port of New York.~~ In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money. *Charter hire not to contribute to General Average.*
126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~ *See New Jason Clause as attached.*
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133    20.    Fuel used by the vessel while off hire, also for cooking, ~~condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.

135    ~~21.    That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *No drydocking during main period of this Charter Party except for emergency. Vessel will deliver to Charterers ex drydock.*
139 *See Line 19 above.*

140    22.    Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes* ~~derricks~~) capable of handling lifts up to ~~three tons~~ *vessel's*
140 *description*, also
141 providing ropes, falls, slings and blocks *as on board*. ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel lanterns and oil *sufficient light* for
143 night work, ~~and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel.

145    23.    Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches,~~ shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149 insufficient power to operate winches *affecting vessel's operations*, , Owners to pay for shore engine, or engines, *crane or cranes* in lieu thereof, *and*
149 *extra expenses including standby expenses, up to maximum of one shift* if required, and pay any loss of time occasioned
150 thereby *in which case vessel to remain on hire provided always that such insufficiently or disablement is not caused by the act,*
150 *neglect or omission of stevedores including winchmen.*

151    24.    It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153 etc.," in respect of all cargo shipped under this charter to or from the United States of America. ~~It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~
155 ~~U. S. A. Clause Paramount~~
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any terms of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 *See New* Both-to-Blame Collision Clause *as attached.*
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167    25.    The vessel shall not be required to *force ice nor follow ice breakers nor to* enter any ice-bound port, or any port where lights or light-ships
167 have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *See also Clause 38*

170    26.    Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the

171  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172        27.  A commission of 2 1/2 *1.25* per cent is payable by the Vessel and Owners to *Howe Robinson Shipbrokers, London*
173  ................................................................................................................................................................................................................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175        28.  An address commission of *2.25* 2 1/2 per cent payable to .....*Charterers*................................................ on the hire earned and paid under this Charter.

Clauses ......*29* ...... to *80* ......, *Description/Baltic Exchange Questionnaire, Conwartime 1993, New Jason Clause, Canadian Clause Paramount, U.S.A. Clause Paramount, Chamber of Shipping General Clause Paramount (incorporating the Hague-Visby Rules) where applicable to apply and the New Both-to-Blame Collision Clause,* inclusive as attached hereto, are deemed to be fully incorporated in this charter party *and bills of lading hereunder.*

Owners                                                      Charterers
        PER AUTHORITY OF
     OCEANTRADE CORPORATION
   BY BULKAMERICA CORPORATION
   ..................................................................    ..................................................................................................................
              AS AGENTS ONLY

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



**M.V. "THOMAS C"**
**CHARTER PARTY DATED 23rd JUNE, 2004**
**ADDITIONAL CLAUSES**

---

### Clause 29

Master to send daily notice of vessel's estimated delivery time to Charterers' agents.

### Clause 30    House Flag/Markings

Deleted.

### Clause 31

Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals and equipment and fittings in accordance with vessel's Description Clause, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and bunker within the trading limits of this Charter party, even where such certificates, approvals, equipment and fittings, become necessary before or after the commencement of this Charter Party.

The ISPS certificate is on board the vessel.
It is the responsibility of the Master and Owners to arrange for any special vaccination required at ports of call and to keep on board corresponding valid certificates.

Failing this, any time lost and all proven extra expenses including cost of watchmen if imposed by USCG as a direct result of Owners' such failure to be for Owners' account, and may be deducted from the hire.

### Clause 32    International Tonnage Certificate

Upon delivery the vessel shall have on board an International Tonnage Certificate valid for the duration of this Charter Party and such Tonnage Certificate shall be acceptable by the local authorities at the countries of call within the trading limits of this Charter Party. Should such Tonnage Certificate not be acceptable to the local authorities and/or result in an uplift of port expenses, time and expenses for issuing an acceptable Tonnage Certificate and/or an uplift in port expenses shall be for Owners' account.

### Clause 33    ITF/Flag Restriction

Owners warrant that the officers and crew of the vessel are covered for the duration of this Charter Party by PSU-ITF TCC (Philippine Seaman's Union, Total Crew Costs) which is acceptable to the I.T.F. and which is acceptable world-wide (including Denmark, Norway, Sweden, Finland, Australia and New Zealand) or other bona fide trade union agreement conforming to I.T.F. standards. Loss of time as a result of non-compliance shall be considered off-hire.

**M.V. "THOMAS C"**
**CHARTER PARTY DATED 23rd JUNE, 2004**
**ADDITIONAL CLAUSES**

----------------------------------------------------------------

**Clause 33 – continued:**

In the event of loss of time, delay or impossibility of or restriction on the full working
of the vessel resulting from any action that may be taken against the ship by third
parties on grounds due to or connected with the country or registration of the ship, the
flag flown by the ship and conditions upon which the crew of the ship is engaged and
employed by the Owners are to remain responsible for the above mentioned action,
loss of time, delay or impossibility of or restrictions of working, and any time lost
consequently upon the above by third parties shall be considered as off hire and to be
deducted from the hire and any extra expenses resulting directly from such action
shall be payable and paid for the Owners, or in Charterers' option, shall be deducted
from the hire.

Owners warrant that the vessel is not black-listed by any country within the trading
limits of this Charter Party.

**Clause 34     Oil Pollution**

Owners warrant that throughout the currency of this Charter, they will remain cover
for protection and indemnity risks, including liability for oil pollution.

Vessel to have on board all valid certificates as at the date of the Charter Party (and
any future requirement provided such future requirements are obtained from Owners'
P and I association) necessary for the agreed trading limits including the United States
of America.

**Clause 35     P and I Club/Cargo claims**

Owners guarantee that the vessel is entered and shall remain entered in a Protective
and Indemnity Association, as stated in the Description Clause, for the duration of this
Charter Party. Entry shall include but not be limited to full cover for cargo claims of
any nature.

Any liability to third parties for cargo claims shall be borne by
Owners/Timecharterers in accordance with the Inter-Club NYPE Agreement as
amended May 1996 and any subsequent amendments thereto.

The party having paid the claim/s shall submit same to other party with supporting
documents as soon as possible but neither party shall between themselves refer to the
two (2) years time limit as defence.

Head Owners' P and I Club: Gard

**M.V. "THOMAS C"**
**CHARTER PARTY DATED 23rd JUNE, 2004**
**ADDITIONAL CLAUSES**

---

**Clause 36    Liability Insurance.**

The Charterers shall not be responsible for loss of life nor personal injury nor arrest or seizure or loss or damage to the vessel, her cargo and/or other objects arising from perils insured against by customary policies of insurance unless caused by Charterers or their servants.

**Clause 37    Loss of time**

With reference to line 97, notwithstanding any reference to loss of time throughout this Charter Party, it is clearly understood that the vessel will be placed off hire only in the event that she is not in Charterers' use wholly or partly, in the latter case off hire to be proportionally applicable.

Any off hire time can be added in Charterers' option to the end of the maximum period of this Charter.

**Clause 38    Trading Exclusions/War Risk Insurance/Ice Trading**

Vessel to be employed in lawful trades for the carriage of lawful merchandise only specifically excluding Israel and Israeli controlled territories, Cuba, Turkish occupied Cyprus, North Korea, CIS Pacific, Liberia, Lebanon, Eritrea, Ethiopia. Sudan, Somalia, Iran, Libya (if/when US-UN sanctions are lifted on Libya then Charterers allowed trade same), Sea of Azov in winter conditions, all war and warlike zones, as defined by the war risk clause (Conwartime 93) contained this Charter Party.

Vessel is not allowed to trade to ports/areas, which are prohibited from trading by the USA-United Nation and/or international organisations of the USA-United Nations.

Charterers have the right to call Iraq for the discharge of USA-United nations approved cargoes, in which case all additional war risks premium, if any, to be for Charterers' account.

If an area to which vessel is bound becomes a war zone or warlike zone after commencement of the voyage, the war clause (Conwartime 93) of this Charter Party to apply.

Vessel not to trade directly between China and Taiwan.

**M.V. "THOMAS C"**
**CHARTER PARTY DATED 23rd JUNE, 2004**
**ADDITIONAL CLAUSES**

---

### Clause 39    Cargo Exclusions

The following cargoes are excluded from carriage:

All dangerous, injurious and inflammable or self combustible cargoes and the
following: bombs and any kind of explosives, blasting caps and detonator caps,
dynamite, TNT, charcoal, D.R.I./D.R.I.P., H.B.I. fishmeal, oilcakes, pitch, garbage of
any kind (used paper with commercial value shall not be considered as 'garbage of
any kind), resins, radio isotopes, nuclear and radioactive cargo waste/materials or its
products, war materials, arms and ammunitions, livestock, animals, shavings, cotton,
ammonium nitrate except if fertilizer grade, sunflower seed expellers, copra, meat
bone meal, hides of any kind, naphtha, petroleum and its products (but petcoke always
allowed), asphalt, tar/bitumen or any of it's products., creosoted goods, acids, calcium
carbide/chloride hydrochloride, motor spirits, motor blocks and metal
turnings/shaving/borings. Deck cargo, any kind of logs not to be allowed.

Notwithstanding the above Owners guarantee that vessel is suitable for and Charterers
are allowed to carry any kind of grain/grain products/agricultural products such as
meals, pellets and expellers (excluding sunflower seed expellers) in bulk.

During the currency of this Charter party Charterers are permitted to lift following
cargoes with specific provisions as hereunder. None of these to be last under this
Charter:-

Maximum 3 cargoes annually in total out of cement and clinker but in any case
always maximum 2 cement, however cement not to be the first cargo after vessel's
drydock.  No more than 2 consecutive voyages of such cargoes.

Charterers may lift maximum 2 salt cargoes annually of which minimum1 to be rock
salt.  Limewashing if required by Owners to be effected by Charterers at their
time/expense.

Charterers may lift maximum 1 scrap cargo either hms 1+2 or shredded scrap, non
oily and always excluding m.b.t.

Charterers to observe soft loading clause whereby first layers of scrap to be gently
lowered and loaded on vessel's tank top forming a cushion prior balance cargo loaded
to Master's satisfaction.

Charterers to have the option to carry part cargo of maximum 1 hold ferro-silicon.
Charterers undertake that loading/stowing/carriage/discharge to be strictly in
accordance with IMO and local/dot regulations with Charterers supplying, fitting,
removing at their time, risk and expense all necessary fittings such as (but not
necessarily limited to) portable ventilation and testing equipment plus safety
equipment for crew sufficient to comply with said regulations. Owners are entitled to
appoint their class and/or P and I surveyor to approve the installation and this fee to
be for Charterers' account.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

---

### Clause 39 – continued:

All cargoes to be loaded/stowed/carried/discharged in strict conformity with I.M.O. and local regulations. Any extra fittings /equipment/etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense.
The intended cargo for this trip is coal/coke.

### Clause 40    Bunkers

On delivery vessels expected to have about 550 metric tons IFO and about 50 metric tons MDO.
Bunkers on delivery sufficient to reach discharge port with safety margin.
Bunkers on redelivery as on board without replenishment by Charterers.
Charterers to pay Owners estimated consumable bunker for the voyage together with first hire payment.

Owners option to replenish bunkers in Singapore at Owners time risk and expense.

Bunker prices: USD190.00 / 350.00 per metric ton for IFO/MDO respectively.

Upon delivery or after arrival at first port after delivery, and upon redelivery or at the last port/s before delivery, a joint bunker survey shall be made in order to establish bunker figures upon delivery, respectively redelivery and such figures shall be final and binding upon both parties. The Charterers will be represented by their supercargo/es or appointed surveyor/s and the Owners by the Master and/or Chief Engineer.

### Clause 41    Weather Routing

Charterers may supply Ocean Routes or International Routing Service (Greece) advice to Master during voyages specified by the Charterers. The Master to comply, at his discretion, with the reporting procedures of the routing service. The vessel shall be capable at all times during the currency of this Charter party, of steaming about 14 knots in good weather. For the purpose of this Charter party "good weather conditions" are to be defined as weather conditions and wind speeds and not exceeding Beaufort Force 4 and Douglas Sea State 3. Evidence of weather conditions to be taken from the vessel's deck logs and independent weather bureau reports. In case of conflict, weather bureau's report to prevail. All calculations to be done in accordance with English Law.

### Clause 42    Master's/Crew's Assistance

With reference to Clause 8 of this Charter Party "customary assistance" shall include but not be limited to all opening and closing of hatches when and where required if permitted by local regulations.

It is understood that the Master will authorise the Charterers or their agents to sign Bills of lading on his behalf in accordance with mate's receipts.

# M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
### ADDITIONAL CLAUSES

---

### Clause 42 – continued:

Deck cargo to be carried only at Charterers' risk and expense always within vessel's stability capabilities, always subject to Master's satisfaction.

Furthermore, it is understood that the Master shall supervise the stowage of the cargo thoroughly and let one of his officers supervise all loading, handling, stowage and discharge of the cargo and he is to furnish the charterers with stowage plans as well as tally ships and other documents as the case may be.

The Master shall be responsible for all gear, equipment and/or stores supplied to the vessel by or for Charterers' account and the Master shall keep a record of all such gear, equipment and/or stores so supplied and to maintain same in good condition.

Such gear, equipment and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners, or if required by the Charterers, at any time during the Charter in like good order and condition as supplied, except fair wear and tear. The Owners shall make good any shortage and/or damage unaccounted for.

### Clause 43    Supercargoes/Port Captains

At any stage of this Charter Party, the charterers and/or their supercargoes shall have fires and unlimited access to the whole vessel as per Master's discretion and without interfering with the ship's operations, which not to be unreasonably withheld including bridge, holds and engine room and also to all vessel's tanks including but not limited to bunkers, lubricating oil, sludge, ballast and freshwater tanks. Also to the vessel's deck and engine logbooks, tankplans, calibration scale and/or other plans as requested, alternatively Charterers have the option to accept bunker qualities as per Master/Chief Engineer's figures.

Whenever required by the Charterers and/or their surveyors, and subject to conditions prevailing at the time the request is made allowing, the Master will endeavour to bring the vessel into even trim ensure correct bunkers sounding.

### Clause 44    Performance

If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

### Clause 45    Stevedore damages

Charterers shall not be responsible for any damages sustained to the vessel or her fittings during loading and discharging unless such damages are notified in writing to Charterers' representatives or their local agents by the Captain, within 24 hours of occurrence, except in the case of hidden damages, in which case these are to be notified on completion of discharge. Master to endeavour to obtain admission of liability from the party responsible.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

Clause 45 – continued:

Any damages affecting ship's seaworthiness, cargo worthiness, class to be repaired by
Charterers at their time and expense at the port where vessel sustained such damages.
All other damages not affecting seaworthiness, class to be repaired by the Owners
during the scheduled dry dock at all Charterers' expenses against original vouchers.

Clause 46    Off Hire

Deviation and/or delay because of sickness of the crew shall be considered as off hire
and all extra expenses in this connection shall be for Owners' account, and shall be
deducted from the hire.

After suspension of hire, from any cause, the vessel shall be placed again at
Charterers' disposal at the same port or place or equidistant position where hire was
suspended.

If the vessel has been off hire for a period of 30 (thirty) consecutive days during this
Charter party, the Charterers are at liberty to cancel the balance of period of this
Charter Party, and redelivery shall take place upon vessel being free of cargo.  This
provision will not apply when vessel drydocking.

Clause 47    Punctual Payment

With reference to Clause 5 (five) it is agreed that the hire is to be considered correctly
paid upon charterers' bankers' irrevocable confirmation of remittance of the hire to
Owners' bankers as stated in Description Clause.

Charterers have no right to make any deductions from hire for Owners' expenses;
Owners will settle same with Agents directly.  Charterers are allowed to deduct
estimated value of redelivery bunkers from last sufficient hire payment.

Clause 48    Arbitration Clause

That should any dispute arise between Owners and the Charterers, the matter in
dispute shall be referred to three persons at London, one to be appointed by each of
the parties hereto, and the third by the two so chosen, their decision or that of any two
of them shall be final an for the purpose of enforcing any award, this agreement may
be made a rule of the country.  The Arbitrators shall be commercial men.

Small Claims Arbitration Clause

For disputes where the total amount claimed by either party does not exceed U.S.
$50,000, the arbitration shall be conducted in accordance with the Simplified
Arbitration Procedure of the Society of Maritime Arbitrators Inc.

**M.V. "THOMAS C"**
**CHARTER PARTY DATED 23rd JUNE, 2004**
**ADDITIONAL CLAUSES**

---

**Clause 49    Speed and Consumption**

Good weather conditions and about shall mean maximum Beaufort 4 (four) wind and Douglas Sea State 3 and plus/minus 0.5 (one half) knot respectively.

**Clause 50    Lieu of Cleaning on Redelivery**

With reference to Line 54, the Charterers have the liberty to redeliver the vessel with unclean holds, against paying the Owners USD4,000 in lieu of cleaning including dunnage removal.  Charterers/stevedores however to undertake to place dunnage on deck at Master's designated area, for later disposal.  If local regulations/authorities require (mandatory) dunnage removal/disposal ashore then same to be for Charterers' account.

**Clause 51**

Deleted.

**Clause 52**

Deleted.

**Clause 53**

Deleted.

**Clause 54**

The bunkers to be delivered to the vessel must not contain waste lubricating oil, chemical waste, or any other substances which are not inherent to bunkers.

Fuel specifications to read:     IFO Viscosity 380 CST at 50 deg. with RMG35 (ISO 8217)
MDO specification: DMB according to ISO8217

The Vessel is a member of the Det Norske Veritas Fuel Quality Program.  Three bunkering delivery samples will be taken, at the Custody Transfer Sampling Point, (vessel's manifold), using Drip Line Sampler.  Physical supplier to be asked to participate in sampling operations.  Samples thus taken, to be considered representative and binding signed and sealed by both parties.  Two samples to be retained by ship and the third to be given to supplier's barge.  Ship's sample will be sent for analysis at DNVP.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

-------------------------------------------------------------------------------------

### Clause 54 - continued

The Owners reserve their rights for any damage to the main engine and/or auxiliaries caused by the use of unsuitable fuel or fuel not complying the agreed specification. Furthermore failure by the vessel to perform in accordance with its described levels following the supply of fuels by Charterers, not falling within the above specifications, shall not be actionable by Charterers and shall not constitute an off hire event or a breach of any relevant provision of this Charter Party by the Owners.

Owners accept IFO grade RMF-25 in South African ports where RMG-35 is not available, however depending on the actual/final specification of same Owners may require to burn about 1.8 mts MDO daily in auxiliaries, in which case the daily consumption of IFO at sea will be reduced by the corresponding quantity (abt 1.8 mts).

If MDO is unavailable at bunker ports then Owners will permit gas oil DMA to be supplied. In countries where the only suppliers are state oil companies (e.g. Egypt, China etc) then the state oil companies fuel and diesel/gas oil specifications compatible with vessel's prescribed bunker specs are to apply.

### Clause 55

All taxes whatsoever on cargo and/or freight and/or hire and /or vessel to be for Charterers' account excluding only those levied by the country under whose flag vessel sails. Charterers hereby indemnify and hold Owners harmless in the event of any taxes imposed on them for cargo and/or freight and/or hire and/or vessel by any authorities, local or federal, by reason of trading under this Charter Party.

### Clause 56

A.  The parties (owners and Charterers) warrant that no Bill of Lading issued under this Charter shall given effect to the provisions of the United Nationals Convention on the Carriage of Goods by Sea 1978 (The Hamburg Rules) unless these rules apply according to article 2.1 (a) or (b) or (c).

B.  In the event the Owners incur liability under Bills of lading as a result of the Charterers' breach of (A) above, then the Charterers will indemnify the Owners liability (including legal costs on an indemnity basis) which the Owners may incur insofar as they are incurred by the incorporation of the Hamburg Rules and not the Hague or Hague Visby Rules or other provisions which would have applied if the Hamburg Rules had not been incorporated.

C.  The parities agree that any liability incurred under the said Hamburg Rules (when applicable under (a) above) shall be apportioned in accordance with the Interclub New York Produce Exchange Agreement (as amended May 1984) Article ½.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

---

### Clause 56 - continued

D.    The Hamburg Rules shall not apply to any apportionment of liability under this Charter save as stated above.

### Clause 57

First hire/bunker payment to be effected within 3 days after delivery.

Hire to be paid as follows:


To be advised


### Clause 58

No through Bills of Lading to be used.

### Clause 59    Letters of Indemnity

The discharge port shown in the Bill of Lading is not to constitute a declaration of discharge port and the Charterers are to have the right to order the vessel to any port within the terms of the Charter party. The Charterers hereby indemnify Owners against any claims brought by the Bill of Lading holder by reason of change of destination. Prior to deviation, Charterers undertake to provide Letter of Indemnity required by Owners, based on Owners P+I wording. Prior to commencement of discharge, the first original set of Bills of lading to be swapped with Owners in exchange for the new set of Bills of Lading showing the changed destination.

Should the Bills of lading not arrive at the discharge port in time, then the Master is to release the entire cargo to the Charterers' order without presentation of the original Bill of lading, provided always that Charterers furnish Owners with necessary letters of Indemnity as per Owners' P and I Club recommendations signed by Charterers only. If is agreed, the signed letter may be presented to Owners by signed telefax with the original forwarded as soon as possible. Charterers to issue in writing to the Master with a copy to Owners their instruction as to whom cargo to be released to.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

---

#### Clause 60    Sub Charterers

Without prejudice to Charterers' liberty to sub-let the vessel and they remaining responsible, nevertheless for the fulfilment of this Charter Party, it is hereby understood and agreed between Owners and Timecharterers that instructions given to the Master and/or Owners by any Sub-Charterers shall be treated as instructions of the Timecharterers for the purpose of this Charter and the sub-Charterers as the agents of ht Timecharterers accordingly. Charterers to notify master immediately whenever they require him to follow instructions of Sub-Charterers.

During the charter period, Charterers not to sublet vessel to Cuban, Libyan, North Korea, Sudanese, Syrian registered and/or based and/or controlled companies. Charterers also not to sublet vessel to the companies based and/or owned and/or registered and/or controlled in the countries against whom USA-UN sanctions may be imposed from time to time.

#### Clause 61    Description Clause

As attached.

#### Clause 62

Detached.

#### Clause 63    International Safety Management Code (ISM Code)

Owners warrant that they and/or the operators of this ship are issued a Document of Compliance relevant to this particular vessel and that the vessel's holds a valid Safety management Certificate. Owners further warrant that these certificates will be maintained throughout the period of this Charter. The Owners shall be liable for and the Charterers shall have full indemnity against the Owners in respect of all losses howsoever suffered by Charterers through Owners' failure to maintain such certificates and/or from Owners' non compliance with the ISM Code. Additionally and without prejudice to the aforesaid Charterers may without prior notice terminate the Charter in case Document of Compliance and/or the Safety Management Certificate is revoked.

#### Clause 64    Grabs

Charterers' option to fit grabs or magnets onto vessel's cranes in their time and expense. Vessel to supply sufficient power to operate four (4) grabs/magnets and vessel's cranes simultaneously. Owners confirm power of cranes 440V/60HZ or 380V/50HZ to power all grabs/magnets simultaneously. Shore labour to drive cranes at Charterers' time/expense/responsibility. Charterers allowed to stow grabs on board at their risk/expense. Any cradles/lashings to be removed at Charterers' time and expenses prior to redelivery. Owners recommend to use maximum 10 cbm grabs.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

---

### Clause 65

Separations between cargoes, other than natural to be for Charterers' account/risk and expense.

### Clause 66    U.S. Trade-Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CRF Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty to the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of the Clause shall be for the Charterers' account.

### Clause 67    Safe Stowage and Trimming

Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnage and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expense.

### Clause 68    U.S. Trade Anti-drug Clause Act 1986

The Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

### Clause 69

Basic war risk insurance to be for Owners' account. Charterers shall pay Owners any increase in premium or call and/or any additional premium payable during the currency of this Charter to war risk underwriters and/or to any mutually war risks association for the war risks insurance of the vessel, her officers and crew (including insurance of detention and diversion expenses and insurance against the risks of blocking and trapping) due to Charterers' trading.

M.V. "THOMAS C"
CHARTER PARTY DATED 23rd JUNE, 2004
ADDITIONAL CLAUSES

---

**Clause 69 - continued**

Charterers shall reimburse Owners the premia and calls referred to in the preceding sub-clause immediately upon presentation to them of the premium debit notes from the vessel's war risk underwriters or mutual war risks association. Charterers shall pay crew war risk bonuses.

Any such extra insurance premia is payable by the Charterers after receipt of proper original and receipted invoices from Owners' Underwriters. Such extra insurance to be net of rebates and not to exceed the amount charged had the vessel been entered with Lloyds of London Underwriters.

**Clause 70**

Deleted.

**Clause 71    Double Banking Clause**

(a)    The Charterers shall have the right, where and when it is customary and safe for Vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessel to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c)    Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)    The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

## M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

---

### Clause 72      Hold Condition on first voyage

Vessel on her arrival first and subsequent load port(s) of first voyage to have all holds/cargo carrying compartments clean, dry, free of loose rust and/or scale and cargo residues and ready in all respects to the satisfaction of the Charterers' surveyor and/or such other recognised local authority or official as local regulations or shippers may require to receive permitted cargo which the vessel may be required to load, if, on presentation for loading at any or all of the loading port(s) on first voyage the vessel should fail to pass the above cargo survey(s), then all expenses for cleaning and/or fumigation including cost of labour standing by, and any wagon or truck or barge demurrage and all other standby charges/expenses to be for Owners' account, and the vessel to be off hire form time of rejection until it is in all respects ready to load and survey passed.  If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartment which have passed survey, however, if thereafter there should be any delay owing to non acceptance of any hold/cargo carrying compartment, vessel shall be wholly off hire until the loading programme can be fully resumed.  In case of vessel failing cargo holds survey Owners immediately to take all necessary steps at their expense to have the vessel passed with minimum delay including hiring shore labour /equipment if necessary.  Clause 59: On/off-hire survey

At port of delivery or at first load port, in Owners' time and at last discharge port prior to redelivery, in Charterers' time, a joint on/off hire survey to be held by a single independent surveyor jointly appointed.  Cost of same to be equally shared between Owners and Charterers.  Vessel only to be of hire for actual working time lost due to surveys.

### Clause 73      Plans

Owners to courier to the Charterers capacity plan, deadweight scale, and general arrangement plan latest within 7 days after fixing.

### Clause 74

Owners are at liberty to sell vessel during the currency of this Charter Party with charter attached.  Charterers to be duly advised of Owners' intentions in this regard. The prospective new Owners/managers to be subject to Charterers' approval which not to be unreasonably withheld.

### Clause 75      Deleted.

## M.V. "THOMAS C"
### CHARTER PARTY DATED 23rd JUNE, 2004
### ADDITIONAL CLAUSES

**Clause 76    BIMCO U.S. SECURITY CLAUSE FOR TIME CHARTERING**

If the vessel calls in the U.S. including any U.S. territory, the following provisions
shall apply with respect to any applicable security regulations or measures,
notwithstanding anything else contained in this Charter Party, all costs or expenses
arising out of or related to security regulations or measures required by any U.S.
authority including, but not limited to, security guards, launch services, tug escorts,
port security fees or taxes and inspections shall be for the Charterers' account, unless
such costs or expenses result solely from the Owners' negligence.

**Clause 77**

Charterers to ensure that all dunnages supplied to the vessel to be in compliance with
latest USDA Plant Protection and Quarantine requirements and relevant certificates to
be supplied to the Master when calling USA port.

**Clause 78**

Charterers' option to cut/reweld holes in vessel's hatches to facilitate the loading of
bulk cement, same to be done at Charterers' time/expense and to vessel's class
surveyors satisfaction.

**Clause 79**

Deleted.

**Clause 80    Padeyes in Holds**

Charterers have the option of welding padeyes in the holds to facilitate cargo
work/lashing etc., subject to Master's final approval as to location of fitting/welding.
Such padeyes to be removed by Charterers in their time and at their expenses, prior to
redelivery of the vessel or when reasonably required by the Master and always to
Master's satisfaction, failing which USD10.00 per padeye will be for Charterers'
account.  No padeyes to be welded to vessel's deck.


All negotiations and fixture to be kept Private and Confidential.

# M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

### CLAUSE PARAMOUNT

"(1) This Bill of Lading shall have effect subject to any national law making the International Convention for the Unification of certain rules of law relating to Bills of Lading signed at Brussels on 25th August 1924 (the Hague Rules) or the Hague Rules as amended by the Protocol signed at Brussels on 23rd February 1968 (The Hague/Visby Rules) compulsorily applicable to this Bill of Lading. If any terms of this Bill of Lading be repugnant to that legislation to any extent, such terms shall be void to that extent but no further. Neither the Hague Rules nor the Hague/Visby Rules shall apply to this contract where the goods carried hereunder consist of live animals or cargo which by this contract is states as being carried on deck and is so carried.

(2) Save where the Hague or Hague/Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or places of issue of the bill of Lading making the United Nationals Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules) compulsorily applicable to the Bill of Lading in which case this Bill of Lading shall have effect subject to the Hamburg Rules which shall nullify any stipulation derogating therefrom the detriment of the shipper or consignee.

### NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### BOTH-TO-BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply

### NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods,

## M.V. "THOMAS C"
### CHARTER PARTY DATED 23rd JUNE, 2004
### ADDITIONAL CLAUSES

---

### CONWARTIME 1993

1.      For the purpose of this Clause, the words:

        (a)      "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

        (b)      "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2.      The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3.      The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4.      (a)      The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls therefore shall be for their account.

        (b)      If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5.      If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6.      The vessel shall have liberty:

        (a)      to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

# M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

-------------------------------------------------------------------------

### CONWARTIME 1993  (Cont'd)

(b)     to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c)     to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)     to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e)     to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

7.      If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging port, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8.      If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### M.V. "THOMAS C"
### CHARTER PARTY DATED 23rd JUNE, 2004
### ADDITIONAL CLAUSES

M/V THOMAS C
TIMECHARTER DESCRIPTION

EX NAME: WHITE EAGLE
SDBC, MARSHALL ISLANDS FLAG, BUILT JAN 1999
SUMMER DWAT 46685M TONS ON 11.36 METERS SSW DRAFT
TPC ON FULL SSW: 53.41M TONS
LOA: 187.30 METERS - BEAM: 32.235 METERS
GRT/NRT: 26862 / 15730
GRAIN / BALE 59830.1 CBM / 58135.2 CBM
CUBIC BREAKDOWN BY HOLD (ALL CBM)

| HOLD | GRAIN | BALE |
|------|-------|------|
| NO. 1 | 10321.0 | 10054.0 |
| NO. 2 | 12644.5 | 12259.9 |
| NO. 3 | 12178.2 | 11789.1 |
| NO. 4 | 13030.2 | 12608.5 |
| NO. 5 | 11656.2 | 11423.7 |

5 HO/HA
HATCH COVER TYPE: ELECTRO-HYDRAULIC END-FOLDING TYPE
HATCH DIMENSIONS: NO. 1 20.00 X 15.00
                            NO. 2-5  20.80 X 18.30
4 X 30 TON CRANES
SPEED AND CONSUMPTION:
ABOUT ABT 14 KTS ON ABT 28 MT IFO380 CST + NIL DIESEL AT SEA
(AVERAGE)
IN PORT:
GEAR IDLE: 2.0 MT IFO + NIL DIESEL
GEAR WORKING 24 HOURS: 3.0 MT IFO + 1.0 MT MDO
ALL DETAILS ABOUT

PART A. SPECIFICATIONS
1) Vessel's Name: THOMAS C
2) Former Name: White Eagle
3) Type of Vessel:single deck bulk carrier
4) Flag Grand Cayman
5) Shipyard/year and month vessel was built: Jan/1999 at Sanoyas Shipyard, Japan
6) LOA (m): 187.30
7) Beam (m): 32.235
8) Depth moulded (m): 16.1
9) International GRT/NRT: 26862/15730
10) Suez Canal GRT/NRT: 25387/22004
11) Panama Canal GRT/NRT: 26862/15730
12) Summer Dwat (mt) on max. summer draft:        46685 on 11.360
13) Winter Dwat (mt) on max. Winter draft:        45433 on 11.124m
14) Panama Dwat (mt) on max. Panama draft:        46685 on 11.360m
15) Summer TPC/TPI 53.41
16) Winter TPC/TPI: 53.25

## M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

17) Grain/Bale (cubic breakdown by hold and total):
   No. 1   10321.0 / 10054.0
   No. 2   12644.5 / 12259.9
   No. 3   12178.2 / 11789.1
   No. 4   13030.2 / 12608.5
   No. 5   11656.2 / 11423.7
   Total:   59830.1 / 58135.2
18) Number of holds, including dimensions (length x breadth):(m)
   No. 1   28.80 x 32.20/26.1 (fore/aft)
   No. 2   28.80 x 32.20
   No. 3   28.80 x 32.20
   No. 4   28.80 x 32.20
   No. 5   28.80 x 31.00/12.00 (fore/aft)
19) Number of hatches, including dimensions: (m)
   No. 1   20.00 x 15.00
   No. 2   20.80 x 18.30
   No. 3   20.80 x 18.30
   No. 4   20.80 x 18.30
   No. 5   20.80 x 18.30

20) Type of Hatch Covers: Electro-hydraulic end-folding type
21)
   aa) Flat tank top dimensions in m:
   No. 1   28.80 x 07.20/22.60 (fore/aft)
   No. 2   28.80 x 24.00
   No. 3   24.00 x 24.00
   No. 4   28.80 x 24.00
   No. 5   28.80 x 23.50/10.77 (fore/aft)
   bb) Strength on tank top per sqm:
   No. 1+5   20.62 mt
   No. 3      23.35
   No. 2+4   20.00
22) Strength on Hatch Covers per sqm
   No. 1      1.75 mt
   No. 2-5   2.20 mt
23) Deck space without obstacles:
24) aa) Number/Capacity and type of gear: 4 x 30ts, electro-hydraulic cranes
      bb)Hoisting speed at full work load - half work load - no work load:
         30/18/6 mt 19/26/56 m/min
      cc) Slewing speed at full work load - half work load - no work load: 0.75 m
      dd)Topping speed at full work load - half work load - no work load:47.6 m/min
         average
      ee)Crane Outreach From Ship's Side: 7.9m
25) Location of Cranes/Derricks:
   Between every two consecutive hatches
26) Vessels Call Sign: V 7 C H 7
27) Port of registry: Georgetown, G.C. 9169342
28) Vessels classification society: American Bureau of Shipping

## M.V. "THOMAS C"
### CHARTER PARTY DATED 23rd JUNE, 2004
### ADDITIONAL CLAUSES

29) Vessels Class: ABS; AMS; ACC
30) Validity period of vessels class certificate: January 2004,
    2000 (copy of vessels class certificate to be faxed to our office)
31) P&I Club: Assurance Foreningen Gard Gjensidig
    (copy of Entry Certificate to be faxed to our office)
32) Distance from waterline to top of hatch coaming
    at 60 pct bunkers + full ballast tanks and no 3 hold empty
    draft: 6.70 meters (aft) and 3.5 meters (fwd)
    wltrohc 14.25 m (no 1) resp 12.18 m (no 5)
    B 60 pct bunkers + full ballast tanks and hold no 3 full
    draft: 7.81 meters (aft)
    wltroch 11.49 m (no 1) resp 10.63 m (no 5)
33) Distance from waterline to highest point
    aa) In heavy ballast condition: 100% bunkers Aft Draft 8.15m 36477 mm
        60% bunkers Aft Draft 7.81 m 36817 mm 10% bunkers Aft Draft 7.04 m
        37587 mm
    bb) In light ballast condition:   100% bunkers Aft Draft 7.11m 37517mm
        60% bunkers Aft Draft 6.69m 37937 mm 10% bunkers Aft Draft 6.52m
        38107 mm
    cc) In laden condition 100% bunkers Aft Draft 12.04m 32587mm 60%
        bunkers Aft Draft 11.77 m 32857mm 10% bunkers Aft Draft 11.21m
        33417mm
34) aa) Distance from tanktop to underside of closed hatch covers: 16360mm
    bb) Distance from tanktop to underside of weatherdeck: 14360mm
    cc) Distance from tanktop to underside tweendeck: N/A
    dd) Distance from tweendeck to underside weatherdeck: N/A
    ee) Distance from top of hopper to underside of weatherdeck: 10260mm
    ff) Distance from top of hopper to bottom of wing tanks: 6060mm
    gg) Distance from ship's rail to inside of hatch coaming: #1 For - 4000mm
        #1 Aft - 7800 mm All other #'s - 6200 mm
    hh) Distance from deck to underside of crane pedestal: 8.3m
    ii) Distance from deck to top of hatch cover: No. 1 - 2.75 m
        No. 2-5 - 2.90 m
    jj) Distance from hatch cover to underside of crane jib:
        No. 1    - 6.35m
        No. 2-5 - 6.20 m
35) Vessels full tank capacity in mt for
aa) IFO: (100 pct): 1940.2 CBM
bb) MDO/MGO:  (100 pct):  261.7 CBM
cc) Fresh water: 380.0 CBM
36) Constants excluding freshwater: 200 MT
37) Quantity of Freshwater on board: 150 MT
38) Freshwater evaporator? Yes
    If yes please advise daily production in mt: 20 mt
39) Are vessel's holds free of obstructions? Yes
40) Is vessel suitable for grab discharge? Yes
41) Does the vessel have grabs on board? No
42) Is the vessel grainfitted? Yes

## M.V. "THOMAS C"
## CHARTER PARTY DATED 23rd JUNE, 2004
## ADDITIONAL CLAUSES

---

43) Is the vessel CO2 fitted? Yes

44) Is the vessel Suez/Pamana Canal fitted? Yes

45) Hold ventilation (natural or electric)? Natural

46) Vessels ice class/strengthened: No

47) Does the vessel have Australian hold ladders?   Yes

48) Is the vessel container fitted? No

49) Is the vessel ITF fitted? Yes

50) Permanent stanchions on deck? No

51) Closed rail?

52) Is the vessel fully logs fitted including all lashing materials and stanchions
    required for a full cargo of logs under/on deck? No

53) Vessel's Telex no. (s):      MARISAT B 353837340

54) Vessel's Phone no.(s):      MARISAT B 353837310

55) Vessel's Fax no.  (s):      MARISAT B 353837320

56) Vessel's E-Mail no. (s)    MARISAT B 353837330

57) Vessel's last six cargos:

58) Vessel last special survey (when/where and nature of work performed): None

59) Vessel's last drydock (when/where and nature of work performed: None

60) Vessel's casualty and pollution history:
    Collisions, Groundings, Pollution, (Oil,/Bunker spills and others) Fire,
    Cargo damage etc. over the last two years: None

61) Has the vessel been arrested in the previous 12months? No

62) Last port state control inspection: Unknown as no records available.
    When: 18 June 01              Where: Praia Mole Brazil
    Problems if any: None
    Vessel passed without recommendation or detention? Yes

63) Hull and machinery insured with: London  Underwriters (leading)
    Insurance Services.
    Insured value: USD 20.5 Mil

64) Lay-Up: has vessel been in Lay-Up (when/where/period): No

65) Warranties:
    aa) Owners warrant that vessel will not be sold for scrap after this
        voyage/period.

67) Master's name and nationality:

68) Number and nationality of crew: 21 Philippino

69) Please confirm that master and crew are speaking fluent English: Yes

# EXHIBIT 3

```
--------------------------------------------
                                          :
In the Matter of the Arbitration          :
                                          :
        between                           :
                                          :
ARMADA BULK CARRIERS LTD.,                :
as Time Chartered Owners of the THOMAS C :        Final Award
                                          :          dated June 26, 2006
        and                               :
                                          :
DAEYANG SHIPPING CO., LTD.,               :
as Charterers                             :
under a Charter Party dated March 11, 2004 :
--------------------------------------------
```

Before:          Peter W. Hartmann, Chairman
                 Manfred W. Arnold
                 A.J. Siciliano


Appearances:     Mahoney & Keane, LLP
                 for and on behalf of Armada Bulk Carriers Ltd.
                 by Edward A. Keane, Esq., of Counsel

                 Law Offices of Richard A. Zimmerman
                 for and on behalf of Daeyang Shipping Co., Ltd.
                 by Patrick C. Crilley, Esq., of Counsel


## INTRODUCTION

This dispute arises under a time charter party, which is one in a chain of related contracts.

- The registered owners, Thomas Navigation Company, fixed the THOMAS C to Armada under time charter (NYPE form) dated September 26, 2003.

- Armada sub-let the vessel to Daeyang under the time charter (NYPE form) of March 11, 2004, under which this arbitration arises.

- Daeyang chartered the vessel out to Oceantrade Corporation (OTC) under a time charter (NYPE form) dated March 31, 2004 and has commenced an arbitration in New York for substantially the same claims. This latter arbitration has been stayed because of OTC's filing under Chapter 11 of the Bankruptcy Code.

- OTC fixed the vessel with KW Bulkers, which charter party is understood to contain a London arbitration clause.

## BACKGROUND

The Armada/Daeyang charter provided for a period employment under which the THOMAS C carried a cargo of pet coke for discharge at Chennai (India).

It appears that the vessel arrived at Chennai on July 18, 2004 and completed her discharge on July 23, 2004 at 13.50 hours. The vessel sailed at 15.00 hours on July 23 for her next employment.

On July 23, the Master sent the following message to Owners, Armada and KW Bulkers,[1] which was then relayed to Daeyang.[2]

> REGRET TO INFORM YOU TT CRANE NO 2 LOWER SIDE OF JIB
> SUSTAINED SOME DENTS WC WE DISCOVER AFTER THE
> COMPLETION OF DISCHARGE HOLD NO. 3 WHICH WE DISCOVERED
> PRIOR TO SAILING TODAY.
> WE PREPARED STEVEDORES DAMAGE REPORT WHICH THEY STEV
> SIGNED HWVR, UPN SIGNING STATEMENT OF FACTS W/OUT YET

---

[1] Armada's Exhibit 4.
[2] Armada's Exhibit 5.

*INCORPORATING THE DAMAGE SUSTAINED IN CRANE JIB NO. 2
STEVEDORES IMMEDIATELY LEFT EVEN WE TRIED TO CONVINCE
THEM TO RETURN FOR US TO ENABLE TO INCORPORATE THE SAID
DAMAGE.
NOW THE VESSEL IS UNDERWAY AS PILOT LEFT AT 1826 LT/23
(1256Z).
THS REGARD KIDLY INFORM RECEIVER AND OTHER PARTIES
CONCERN TO ARRANGE FOR COMPETENT SURVEYOR TO INSPECT
SAID DENT ON CR. JOB NO. 2 AS WE DO NOT HV THE MATERIAL
TIME TO CALL ANY SURVEYOR AT CHENNAI DUE TO SAILING
SCHEDULE AND FOR THS MATTER WE KDLY REQUEST TT
SURVEYOR BE ARRANGE AT VIZAG.
FAXING TO YOU THE STEV DAMAGE REPORT FOR YOUR
REFERENCE.
ALSO, WILL SENT E-MAIL ATTACHMENT REGARDING THE CRANE
JOB FOR YOUR REF IN DUE COURSE.  VERY SORRY FOR THS
INCIDENT.
OUR ETA TO VIZAG ARND 1800HRS/24.
PLS ADV.*

## CLAIMS

Armada's claim is for reimbursement of $67,999.97[3] paid to Head Owner

together with attorneys' fees,[4] costs and "such other and further relief as this panel may

deem just and proper" for the damage repair and related expenses of the No. 2 crane.

Daeyang rejects Armada's claims and in turn asserts a counterclaim for

$67,557.78 together with interest from September 10, 2004, reasonable attorneys' fees,

costs, expenses and arbitrators' fees as well as "other just and proper relief. . . " for lost

time as the result of the non-working condition of the No. 2 crane and the lack of

limewash on board prior to sailing from Mumbai to prepare the vessel's holds for a salt

cargo to be loaded at Onslow (Australia).

---

[3] Armada's Exhibits 17 and 18.
[4] Stated as $14,851.68.

4

## DISCUSSION AND DECISION

Since Daeyang's claim can only succeed if Armada is denied recovery of the crane damage repairs from Daeyang, the panel will first address Armada's affirmative claim.

- **Damage to Crane No. 2.** Armada's claim is for the reimbursement of repair costs and related expenses incurred for the damages caused by the stevedores at Chennai to the lower side of the jib on the starboard side crane No. 2.

There is no disagreement as to the damage to vessel's gear, however, the parties disagree on the liability for this claim.

The vessel signed a document[5] stating:

> This is to certify that the Stevedores Messrs. South India Corporation (Agencies) Limited, Completed Landing/Loading of Cargo without causing any damage whatsoever either to the vessel or to any of its fixtures.

As an aside, it is really of no consequence, as has been argued by Daeyang, whether it was the Master or the Chief Mate who signed this statement.

Clause 45 of the time charter refers to stevedore damages and states:

> Charterers shall not be responsible for any damages sustained to the vessel or her fittings during loading and discharging unless such damages are notified in writing to Charterers' representatives or their local agents by the Captain, within 24 hours of occurrence, except in the case of hidden damages, in which case these are to be notified on completion of discharge. Master to endeavour to obtain admission of liability from the party responsible.

> Any damages affecting ship's seaworthiness, cargo worthiness, class to be repaired by Charterers at their time and expense at the port where vessel sustained such damages. All other damages not affecting seaworthiness, cargo worthiness, class

---

[5] Daeyang's Exhibit B.

> *to be repaired by the Owners during the scheduled dry-dock at all Charterers'*
> *expense against original vouchers.*

Subsequently, a Stevedore Damage Report[6] was issued by the vessel on July 23

for damages caused between 14.10 and 14.20 hours on that day to vessel's No. 2 crane

(lower side of the jib on starboard side).

Daeyang has argued that the vessel's Master and Chief Officer should be

produced to explain the discrepancies and contradictions in their writings and

interviews with respect to the cause of damage to the crane.[7]

The panel has carefully reviewed the record and does not find that the plain

reading of the reports and messages leads to ambiguity or contradictions. The vessel

signed stevedores' statement[8] confirming that the discharge of the cargo was

accomplished without damage to the THOMAS C or its "fixtures," which we accept as

factual. The Stevedore Damage Report[9] states, "Reason of the damage to Crane No. 2

Stb during lowering of payloader from Hold No. 3 after completion of discharge." We

accept the two documents as describing separate events; i.e., the discharge of cargo and

then the landing of the payloader. We do not accept the argument that the damage was

caused "by some post discharge operation of the crane by the Vessel's crew."[10] The

burden, under the terms of the governing contract, rests with Daeyang to show that it

was vessel's crew who discharged the Charterers' stevedores' equipment. Likewise, we

are not persuaded by the references and/or implication of the "by-pass-key." It is our

---

[6] Armada's Exhibit 6.

[7] See counsel's email of May 26, 2006.

[8] Daeyang's Exhibit B.

[9] Armada's Exhibit 6.

[10] Daeyang's Preliminary Statement at p. 1.

opinion that, upon completion of cargo operation, the payloader was discharged by Charterers' stevedores. This result is also supported by Daeyang's own surveyor's statement[11] that "... stevedores discharged the bulldozer from No. 3 hold using No. 2 crane, and during discharging operation of the bulldozer, the right jib frame of the No. 2 crane hit to the jib rest for No. 1 crane around 14.10 hrs. on July 23" as well as the same surveyor's conclusion that "the damage to the No. 2 crane was caused by hit to the jib rest for No. 1 crane due to careless handling by the stevedores ...."

Although indications of Daeyang's willingness to pay for the crane damage are neither dispositive nor binding, they nevertheless do provide support for Armada's position. Therefore, based upon our assessment of the evidence submitted, we find in Armada's favor.

The fact that Daeyang's sub-charterers failed to reimburse Daeyang for the stevedore damages is unfortunate but irrelevant to the issue before us. The privity of contract is limited by the March 11, 2004 time charter to only Armada and Daeyang and, in the absence of consolidation, the responsibilities of OTC or KW have no bearing on the proper resolution of the Armada/Daeyang dispute.

Addressing now the quantum of Armada's claim, we duly considered the comment in The Oriental Survey Co. report[12] that they considered the "... repair estimate cost is too high ...."

---

[11] See Daeyang's Exhibit C at p. 3.
[12] Daeyang's Exhibit C.

Despite Oriental's statement on the repair cost, Daeyang has not provided us with any guidance or rebuttal evidence as to what the repair costs should "properly" have been. Absent such documentation, the panel has no choice but to accept Armada's submission.[13] We, therefore, award to Armada the sum of $67,999.97 together with the interest shown below.

- **Daeyang's Counterclaims.** Although Daeyang's sub-charterer OTC made deductions from hire payments, Daeyang points out that no corresponding deductions were made from their payments to Armada. Thus, not only are Daeyang's counterclaims for indemnity, but all are directly related to and dependent upon Armada's claims for the damage to the No. 2 crane being denied.

We have carefully considered these counterclaims and deny them in full, with the following comments:

1) **Delays at Mumbai** – Apparently it was not possible, because of existing sailing orders, to have the crane damage inspected by vessel's class prior to her sailing from Chennai, which was then carried out at Mumbai. Specifically, the claim is for the non-availability of the No. 2 crane, which Daeyang stated as $9,194.22.[14] The hire statement[15] states the claim to be $8,967.75, as it gives credit for the address commission.

Since we found that Daeyang, in its role as charterer, is liable for the damage to the No. 2 crane, it cannot now argue that it is entitled to recover from Armada for the

---

[13] In prior arbitrations, panels have applied their collective experience to override or adjust claim amounts, however, in this case, the panel did not have the specific knowledge for these costs or access to data in the public domain.

[14] See Daeyang's Statement of Counterclaims at p. 10.

[15] Daeyang's Exhibit E.

hire deductions from charter hire made by sub-charterer OTC. We are also sympathetic to Armada's argument that, if indeed the No. 2 crane was essential to the Mumbai cargo operations, either Daeyang or any one of the other downline charterers could have arranged to substitute shore gear for the damaged No. 2 crane, but none did.

2) **Drifting off Mumbai** – Here too we find a discrepancy between the claim amount on Daeyang's brief ($30,851.90) and the hire statement ($33,387.27). In support of the claim, Daeyang states that it

> . . . *was advised that the crane would be repaired at Mumbai after the completion of cargo operations. Armada informed Daeyang that the repairs would take approximately 4 days to complete. Because of this delay, Daeyang's sub-charterers (OTC) were unable to fix the vessel for a cargo that they had been working for the vessel.*
>
> *Notwithstanding the previous advice, Armada (or the headowners) decided to defer the repairs at the last moment. The vessel departed Mumbai without notice to Daeyang and thereafter commenced drifting off-port limits at Mumbai, only then advising Charterers that the Vessel was now awaiting orders for next employment.*

The panel has not been provided with any contemporaneous exchanges on this matter. Similarly, as Daeyang argues, if deduction were made by OTC, the underlying documentation to the hire deductions would have been helpful to the arbitrators for the evaluation of this claim.

In a chain of charters, there are but two single-interest parties; i.e., the registered owner and the last charterer; anyone in between assumes a dual role of both charterer and disponent owner. The fact that Daeyang is somewhere in the middle of the chain does not relieve it of these dual obligations, even though some of those responsibilities

9

can be passed up or down the chain of charters. This is particularly so if one considers the economical ramifications created by the different daily rates under the charters.[16]

　　3) **Time Lost for Limewash** – Daeyang quantifies its hire loss at $24,161.26.[17] which differs from the 35th Statement of Account[18] showing an amount of $24,518.34. In support of its position, Daeyang argues that the

> . . . *sub-charterers eventually fixed a cargo of salt out of Onslow, Australia. As per Clause 39, Owners required the Vessel's holds to be limewashed prior to loading the salt cargo. The Vessel did not have onboard the required limewash, and as the vessel had already departed Mumbai, without notice, there was no opportunity for Charterers to supply the required limewash. Thus the Vessel was unable to properly prepare the holds during the ballast voyage toward Onslow as would have been the customary procedure.*
>
> 　　*Charterers arranged the limewash on arrival at Onslow and a delay of 0.791667 days was incurred while the vessel prepared the cargo holds with limewash to receive the salt cargo.*

　　Pursuant to Clause 39, "Charterers may lift max 5 salt cargoes annually . . . . Limewashing if required by Owners to be effected by Charterers at their time/expense."

　　Although the salt cargo voyage may have ultimately been for the account of either OTC or KW Bulkers, under the Armada/Daeyang charter, the limewashing was for Daeyang's account and it was incumbent upon Daeyang to ensure it complied with the charter party terms.

---

[16] Thomas Navigation to Armada at $13,000; Armada to Daeyang at $29,250; Daeyang to OTC at $35,000.
[17] Daeyang's Statement of Counterclaims at p. 11.
[18] Daeyang's Exhibit E.

## INTEREST

The arbitrators award simple interest at the rate of 6.83% p.a., representing the weighted average prime rate as published by Chase Manhattan Bank N.A. for the period from February 25, 2005[19] to the date of this award.

## COSTS AND FEES

In line with our decision on the merits of this case, we make an allowance of $9,500 towards Armada's legal fees and costs.

The arbitrators' fees are reflected in Appendix A to this award and are to be paid in accordance with the instructions contained therein. The arbitrators' fees are a joint and several obligation of both parties.

## AWARD

Daeyang is directed to pay to Armada the sum of $83,684.02, which we arrived at as follows:

- Repair costs of crane No. 2       $67,999.97
- Interest thereon       6,184.05
- Allowance towards Armada's attorneys' fees and costs       <u>9,500.00</u>

        DUE ARMADA       <u>$83,684.02</u>

---

[19] Based on Armada's Exhibit 17.

If payment of this award has not been made within 20 days from the date of this award, interest at the rate of 8% p.a. shall continue to accrue on the principal amount of $67,999.97 from the date of the award and continue until payment in full has been made or the award has been reduced to judgment, whichever first occurs.

The arbitration clause provides that the award may be made a rule of the court.


_____
Peter W. Hartmann, Chairman


_____
Manfred W. Arnold


_____
A.J. Siciliano


New York, New York
June 26, 2006

# APPENDIX A

The panel's fees and expenses amount to $7,512,[1] which are assessed two-thirds against Daeyang and one-third against Armada.

Each side had deposited $7,500 into the SMA escrow account. From those deposits, payments are to be made within 15 days from the date of this award as follows:

|  | Payable by Armada | Payable by Daeyang |
|---|---|---|
| M.W. Arnold | $1,087.34 | $2,174.66 |
| A.J. Siciliano | $ 700.00 | $1,400.00 |
| P.W. Hartman | $ 716.67 | $1,433.34 |

After full payment has been made to the arbitrators, the remaining escrow funds plus accrued interest are to be returned to the parties.

In the Matter of the Arbitration
            between
ARMADA BULK CARRIERS LTD.,
as Time Chartered Owners of the **THOMAS C**
            and
DAEYANG SHIPPING CO., LTD.,
as Charterers
under a Charter Party dated March 11, 2004

New York, New York
June 26, 2006

---

[1] M.W. Arnold - $3,262; A.J. Siciliano - $2,100; P.W. Hartmann - $2,150.

# EXHIBIT 4

# OCEANTRADE CORPORATION

c/o 285 Highland Avenue
Norwalk, CT 06854, USA

## INVOICE (Revised 9/27/06)

TO:              KW BULKERS
ATTENTION:       MR CHEN YU
DATE:            27-Sep-06

**REFERENCE:      MV THOMAS C CHARTER PARTY DATED JUNE 23, 2004**

TO:              **STEVEDORE DAMAGE AT CHENNAI JULY 23, 2004**
                 **REPAIR COSTS AND ASSOCIATED LOSSES**

| | |
|---|---:|
| Repair costs to crane #2 per Final Award dated 6/26/06 | $67,999.97 |
| Loss of hire during discharge Mumbai | 9,823.29 |
| Loss of earnings drifting off Mumbai | 36,466.31 |
| Off-hire for repairs at Mizushima | 38,089.70 |
| **Total** | **$152,379.27** |

Remit by wire transfer to:

CITIBANK NA
330 Madison Avenue
New York, NY 10017
USA

SWIFT CODE:          CITI-US-33
ROUTING NUMBER:       21000089
ACCOUNT NUMBER:       58065237
IN FAVOUR OF:         OCEANTRADE CORPORATION DIP ACCOUNT
REFERENCE:            MV THOMAS C KW BULKERS CP

**E.& OE.**